May it please the Court, this is an appeal from a 12B6 dismissal. It raises important issues on Fourth Amendment violations for warrantless entry and excessive force. I also challenge the circuit's moment of threat doctrine that involves supervisory Monell liability and liability under the ADA. I read all the cases in the circuit, investigated all the available facts, drafted a complaint and I believe I plead plausible claims, ask the Court to reverse the district court's dismissal. I want to very briefly touch on the standard review and the issue of the officer's body camera video, briefly touch on the ADA claim and deliberate indifference on the single incident exception and then try to spend the bulk of my time on the Fourth Amendment violations. Of course, I welcome the Court's questions. First of all, Your Honors, I want to talk about how the district court failed to accept the plaintiff's version of the facts on exigent circumstances. In the district court's opinion, it did not address at all, much less accept all the complaints, allegations of dissipation of exigent circumstances at the scene and that there was no ongoing emergency when the officer arrived. Regarding the video, the district court did not consider it and therefore, this court should not. In the August 22 case from this court, the Stevenson case, the court declined to consider documents that were referenced in the complaint because the district court did not consider them. That's the Stevenson case that's in my 28J letter and therefore, I think the court should not be considering it. Did you say that the court did not consider the video? Did I misunderstand you just now? Yes. The district court did not consider it. Okay. I thought there was a motion to strike filed and that was denied. It was denied as moot because the court said it did not consider the video. Okay. And furthermore, I would note that there's no material, there's no allegation from the defendants that the video contradicts the material facts in the complaint. If the court's going to evaluate the video and the evidence, I would ask, I would like discovery if there's going to be a weighing of evidence. Briefly on the ADA claim, the district court relied on this court's 2,000 opinion in the I believe that Haynes is distinguishable on the facts. In that case, the aunt called the police to go pick up her nephew and take him to a mental health hospital and the police went and found him out on the street and confronted him and he had a knife and he was shot. In this case, the plaintiff's wife, excuse me, Steve's wife called and asked for them to check on her husband at his home. He was not out in the street and we also pled in hands. There were exigent circumstances because of the confrontation in the street. Here, when the call was made, there were not exigent circumstances in the dispatch and we've pled that when the officer arrived on the scene, there were no exigent circumstances. Furthermore, I think that the court should revisit hands, in hands. The court failed to address the question that it identified. Counsel, let me ask you about, I know you're going to get to the Fourth Amendment excessive force claim, but two of the claims that got dismissed, one was a, as I understand it, a warrantless entry claim and then of course you just mentioned the ADA claim. With regard to the ADA claim, what specifically is the disability that you're alleging? The person was distraught at the time because apparently he had received or had viewed these messages and so on. You've pled all those facts, but what specifically is his disability? On the warrantless entry claim, I'll let you answer that one as well, the warrantless entry claim was not the officer summoned to the residence because there was an urgency or concern about his actions and his state of mind at the time. What would he have gotten a warrant for? So those are my two questions. I realize they're maybe unrelated, but if you could answer those two, we'll get to the excessive force. I will answer those. On the ADA claim, we pleaded that Steve suffered from depression in the call to the Sheriff's Office. It was imparted to the dispatch that he was, had depression, had been hospitalized years before for treatment and that's the disability under this court's case law and under the  Okay. And with regard to the warrantless entry? Yes. Okay. So the wife called the Sheriff's Office and asked them to go check on her husband, a welfare check, and my position is that once the officer got there, and it was for a suicide threat, but under this court's precedence, we look at the totality of the circumstances even for a suicide threat and we've pleaded facts that show that when the officer was there, there was no ongoing emergency. Any alleged exigency had dissipated. So it would have been better if the officer had done nothing but take the witness in with himself to a magistrate or an authority to swear out a warrant and then go back? Is that, I'm not, you're losing me on the warrantless, and you got other claims, but the warrantless entry claim really loses me from the outset. So you're going to have to flesh that out or we'll move on to the excessive force claim. Well, having not had discovery and knowing only what we know from the officer's body cam video and the 9-1-1, or not the 9-1-1 call, but a call to the Sheriff's Office, there was a potential suicide threat of a man with a gun. I thought the officer had a photo of him with a gun to his chin. The officer did not have that photo, but the wife related that to dispatch. So the officer was aware of the potential, but when the officer got to the scene and encountered the relatives, and there was no ongoing emergency, and it had dissipated, and instead of waiting... Well, other than the fact that he might have committed suicide while they were getting the warrant, there was no emergency, then I suspect the claim would be deliberate indifference for not trying to address the situation, but retreating to get a warrant. I just don't understand the claim, and I don't want you to use all your time talking about it. Well, I think it's important, and I will jump to that, because under this circuit's law, we evaluate it objectively based on a totality of the circumstances. We don't go by the officer's subjective belief, and when he got there, well, he didn't know that everything was okay in the house. He got there, he spoke with relatives who were there, and they were calm. There was no urgency. He should have perceived that there was no ongoing emergency. How long did it transpire from the moment that he opened the door until shots were fired? I believe around eight seconds. Well, yeah. Well, I was going to say just looking at Judge O'Connor's opinion, which purports to quote only from your complaint, she simultaneously, the mom, simultaneously opened the bedroom door when the police officer said hello to the sheriff's office, and then she indicated that everyone was all right. Shortly thereafter, she saw him get up from his chair and walk toward the doorway with the gun. She told him to put it up and then told Deputy Gallardo, he's got a gun. I mean, that sounds sort of exigent to me. Well, I believe the district court's opinion is somewhat incorrect on that sequence of events. The officer opened the door without a warrant and the mother-in-law quickly appeared. I don't know if you can see the door opening on the body cam, but the mother-in-law appeared and she had been sitting in the bedroom and she walked around the bed to the bedroom door, stepped out, and was facing the officer who had opened the door. And I'll also, it's important I believe also that this 23-year-old rookie officer got there before his experienced partner went and went to the house and confronted an alleged mentally ill, suicidal armed man. And the complaint alleges that the mother-in-law saw him pick up his gun as she was walking out and talking to the officer. And she said to him, put it up. The officer heard that because it's on his body cam. And that's why I think this case falls under Waller from 2019. Judge Willie, you were on that opinion. In Waller, they plausibly alleged that the victim was unarmed when he was shot. And I believe that we have satisfied . . . So, I'm sort of baffled. So, there's been no discovery at all, correct, up to this point, zero, right? Zero. So, the gun, was the gun found on the bed after the shooting? Yes. Steve was shot standing in the doorway. The body cam video showed that the gun is 13 feet away in the caddy corner of the bedroom where he had been sitting. So, there's been no discovery. I guess we've got various statements. Because it seems to me that there are these puzzling, inconsistent accounts as to whether Steve had a gun or didn't have a gun. And there's some evidence that suggests he did. And there's other evidence that suggests he didn't. And correct me if I'm wrong about any of this, either side. So, at the record page 23, Mrs. Phillips says to the deputy, he's got a gun. The record page 36, Mrs. Phillips to the deputy, he doesn't have a gun. Record page 39, the gun was found on his bed after the shooting. The complaint says, the complaint says that Steve had gotten up from his chair with his gun. That's the complaint. And he put it down on the bed when his mother-in-law told him to put it up. And he walked to the bedroom door and he was shot. How do you know that? That he put the gun away? Because it's 13 feet away from him. But you didn't look at him. Correct. But we have the body cam video that shows . . . Wait a minute. You're telling us not to look at the body cam video. Right. Well, the complaint, and I admit, I used the body cam video to draft the complaint. Which I . . . And so, here's my answer to Judge Willett. He was sitting in the corner of his room. His gun was tucked in between the mattress and the sideboard. When the mother-in-law hears the officer at the door, she gets up. She sees him grab the gun. And as she's walking to the bedroom door, she tells him, put it up. Steve is shot in the bedroom doorway, in the chest, in the heart and lung. The gun . . . He goes to the floor. The gun is found 13 feet away. Our forensic expert tested it. His blood is not on it. So, either the gun magically flew in the air and landed perfectly on the bed next to three cell phones, like it had been carefully set there, or he set it down or . . . I have one more question based on what Judge O'Connor wrote where he said he did not rely on the video because he says Mrs. Phillips told Winder to put it up and then told Deputy Gallardo he's got a gun. After this, Mrs. Phillips did not look at Winder again until after he was shot. Mrs. Phillips never saw Winder point his gun at Deputy Gallardo. Yes, Judge Jones. Is there anything inconsistent in that statement by Judge O'Connor with your complaint? Well, I think part of the answer is there . . . What does it mean he's got a gun? He had a gun in his room. She saw him pick it up. How is an officer . . . Never mind. You can answer these on rebuttal. Your red light's on. Thank you. Thank you, Your Honors. Okay. Okay, Mr. Carew. Good morning, Your Honors, and may it please the Court. My name is Trevor Perews-Care, and I'm appearing on behalf of appellees Deputy Gallardo, Sheriff Babcock, and Young County, Texas. With me this morning is my colleague, Stephen Caswiland. The district court properly dismissed plaintiff's complaint because Deputy Gallardo acted squarely within the bounds of this court's well-established case law on warrantless entry and reasonable use of force, and there was no constitutional violation in this case. According to plaintiff's complaint, Steve Winder's wife summoned Deputy Gallardo to the home she shared with Winder. In that home, Winder was holding a gun to his head, was suicidal, was intoxicated, and was emotionally disturbed. Also inside that home was Winder's mother-in-law, an innocent bystander. When Gallardo opened the door after hearing a loud exclamation inside, he was met with an innocent bystander standing in harm's way who informed him that somebody else in the home, Winder, had a gun. At that point, the bystander told Mr. Winder to put the gun up, and Deputy Gallardo himself said, put the gun down twice. When there was no compliance on the part of Winder in a rapidly evolving and volatile situation, Deputy Gallardo pulled the trigger once from his service pistol to dispel the and to the innocent bystander in the home. Your Honors, I'd like to highlight for the Court that the events in this case unfolded within about four minutes from start to finish, just one-fifth of the amount of time that I will be standing at this podium, and that's at record on Appeal 24. Second, appellants flip-flop about whether the body camera footage is relevant or useful. I will cabin my point on that to just say that appellants used it in drafting their complaint, and that we think that this Court doesn't need to review the body camera footage to reach its conclusion, but that it may if it finds it helpful. I'd like to take a couple of moments to recap the relevant facts for the Court. Steve Winder sent his wife pictures of him holding a gun to his head and told her he was suicidal because he believed she had been unfaithful. That's at record on Appeal 14. He was seriously intoxicated and emotionally disturbed. That's at record on Appeal 8. Winder's wife called police asking for a welfare check on Winder at their house, summoning police, and Deputy Gallardo, along with his partner, Deputy Dwyer, were summoned to Winder's house by dispatch. Winder's wife reported to law enforcement that Winder was armed, depressed, and suicidal. That's at record on Appeals 17 and 57. And Deputy Gallardo was told by dispatch that while it was unknown whether Winder was actively trying to harm himself because the reporting person was not on site, that there was a real suicide risk, which is why he was being dispatched. Gallardo arrived at Winder's house. He knocked on the door facing the street and received no response. After waiting for 30 seconds, he then went around the side of the house and encountered a neighbor. When that happened, dispatch informed him that, quote, excuse me, that Winder's mother-in-law may be on the property trying to make contact. That's at record on Appeal 19. At that point, Deputy Gallardo knew that there was a nonresponsive person in the home and that there was another person who had been in the home. Gallardo then approached the home's door with the neighbor, and after the neighbor knocked on that door, there was a muffled, loud voice that could be heard inside the home. That's record on Appeal 20. 20 seconds later, with knowledge that an armed, depressed, emotionally disturbed, and suicidal man was in the house with another person, and after hearing a loud exclamation from inside the home, Gallardo opened the door. After opening the door, Gallardo announced his presence and called out for Steve. That's record on Appeal 22. And then, Winder's mother-in-law appeared, told Gallardo that Winder was upset, and confirmed to Deputy Gallardo that Winder had a gun. That's record on Appeal 22 to 23. And as Your Honors noted, in the complaint, at record on Appeal 22 to 23, the following quotes are present. Winder, quote, grabbed his gun from the side of the bed. He approached his mother-in-law, quote, with his gun, and his mother-in-law told Winder to, quote, put it up as Winder rounded the corner and came up behind his mother-in-law. Enhanced video, and this is also in the complaint at record on Appeal 41, enhanced video from the Texas Rangers investigation shows that something was in Winder's hand at that moment. The video doesn't show exactly what it was, but in the complaint on record on Appeal 41, plaintiffs pled that video could show something was in his hand. Counsel, let me go back. With regard to the contention, or is it, maybe I should say, is it undisputed that Deputy Gallardo did not have and did not view the photographs of Steve holding the firearm, the ones that the wife transmitted? Your Honor, I do not believe that the photographs themselves were shown to police, but I do know that from the complaint, Winder's wife communicated to dispatch that her husband was armed, suicidal, and had sent photographs of him holding the gun and said he could not bear it anymore, I believe is the quote in the complaint. So, at the point that Winder comes into view, Gallardo reached for his service pistol, announced on his radio that Winder had, quote, got a gun, and told Winder to, quote, put it down twice. When Winder did not comply, Gallardo fired one shot from his service pistol, which mortally wounded Mr. Winder. That's record on Appeal 24. And to address Your Honor's questions about what happened with the handgun, Winder fell back to the foot of the bed, and a gun was found on the bed. That's record on Appeal 24 to 25. Gallardo then, upon finding the firearm, unloaded it and secured it. That's record on Appeal 25. So those facts, all of which come straight from Plaintiff's complaint, establish the following. First, there was an exigent circumstance justifying a warrantless entry. Second, the use of deadly force at the moment that Deputy Gallardo pulled the trigger was reasonable. Third, Deputy Gallardo did not fail to accommodate a known disability. And fourth, there can be no supervisor or Monell liability. But aren't there well-pleaded allegations in the complaint that contradict the deputy's observation that Steve had a gun in his hand when he was shot? Your Honor, I think that the complaint is equivocal about that, given the fact that there are pleadings at record on Appeal 21 through 24 where Steve walks into the door frame. And up to that point, it is completely consistent saying that he had a gun in his hands until he walks into the door frame. Obviously, Your Honor, when he's at the door frame, that is not at the side of the bed where my colleague on the other side was saying he put the gun down. According to the complaint, Winder had a gun in his hands when he came into view. Now, I do think that it's unclear because the body cam footage, as it was submitted to the court and as my colleague on the other side reviewed it, doesn't show Winder in perfect full definition. So we can't confirm independently using the body camera footage that there was specifically a gun in his hands. But the complaint, which has pleadings that we have to take as true at this moment, has pleadings saying that when he walked into that door frame and came into view, he had a gun in his hands. And, Your Honor, I'll also note that this court's case law in Allen v. Hayes underlines that whether there is in fact a gun is not the dispositive question. The dispositive question is whether an officer has probable cause to believe that the person that he is confronting has a gun at the moment that he pulls the trigger. And having been told by dispatch and by somebody in the home that Mr. Winder had a gun when he came into view, it would baffle, I think, any reasonable officer to believe that he had to discount, affirmatively discount, both of those pieces of information when presented with somebody advancing upon him an innocent bystander. Your Honors, I would also like to draw your attention to four justices' concurrences in Coniglia v. Strom on the exigent circumstances point. Four justices concurred in that case specifically to give guidance to officers like Officer Gallardo presented with calls involving suicide risk. Justice Kavanaugh specifically concurred in that case and said the following, quote, suppose that a woman calls a health care hotline or 911 and says that she is contemplating suicide, that she has firearms in her home, and that she might as well die. The operator alerts police and two officers respond by driving to the woman's home. They knock on the door but do not receive a response. May the officers enter the home? Of course. And Your Honors, I think that that's consistent with the circuit's case law about exigent circumstances when suicide threats are involved. Judge Jones, I believe that you were on the panel in a case called Clark v. Thompson, in a per curiam opinion, applying previous case Rice, which said that when there are suicide threats involved and when there's corroboration of the means to commit suicide, not just a threat, but corroboration of the means, which we have in this case according to the complaint, that that justifies warrantless entry into the home to secure the safety of the occupants. I'd also like to take a moment to address plaintiff's dissipation of exigent circumstances point. There are lots of facts pleaded in the complaint, but what's missing is a connection between those pleaded facts and Deputy Gallardo's knowledge at the time. There are several paragraphs in the complaint recounting conversations that were being had inside the home and people's belief that Steve was no longer actively suicidal. However, nobody called police to report that information. Deputy Gallardo did not have that information, and in order to impute the information to Deputy Gallardo, he would have needed to be able to listen through walls and see through walls to hear conversations that were probably happening before he reached the house itself. I would just like to underscore that because plaintiffs do make a lot of argument about whether exigent circumstances had dissipated by the time that Deputy Gallardo arrived at the home. They point to Deputy Gallardo's quote-unquote calm demeanor, which I believe is evidence of his competence, that he did not run straight up to the door, kick it in, and try and find out what was going on inside the home. They also point to a neighbor who did not seem overly worried. Our response to that is, well, if she had heard a gunshot, I think that that would have indicated that everything was too late. And so how a neighbor would have known what was going on inside of the home is completely beyond me. And furthermore, that neighbor did not communicate anything about Steve other than the fact that he was inside the home at the time that the officer arrived. All that is to say, Your Honors, that I don't think that there is any well-pleaded part of the complaint that establishes that exigent circumstances had dissipated. And even if they had been at the point that Deputy Gallardo heard the loud exclamation from inside and waited 20 seconds for somebody to come to the door, and the door did not open until he, excuse me, and the door was not opened until he opened the door and announced his presence after a knock, that establishes exigent circumstances given the totality of circumstances that were presented to him at that moment. I'll take a quick moment to discuss supervisor and Monell liability. Supervisor liability requires that the supervisor be personally involved or that there is a sufficient causal connection between the supervisor's conduct and a constitutional violation. As we've argued, there was no constitutional violation in this case. But furthermore, the supervisor's liability is predicated on a policy that itself is a repudiation of rights and is the moving force behind a constitutional violation. So even if a constitutional violation is assumed to have taken place on the facts pleaded in the complaint, and again, we think that the complaint squarely establishes that there was no constitutional violation, there would need to be a policy that was so closely causally linked to the particular injury that the plaintiff sustained that that policy would have to have been the moving force behind it. And furthermore, because there is no pattern of similar incidents pleaded by plaintiffs, it appears as though they are trying to make their claim out under the narrow single instance exception, which I think that this court has explained time and time again is an extremely high bar. I'll take one quick moment to discuss the ADA, and then I will yield the rest of my time for questions for the panel, if the panel has any. The ADA provides for liability when a disabled person is, quote, denied the benefits of a service, program, or activity by the public entity that provides it. In Hines v. Richards, this court held that a person's own acts, such as assaulting an officer with a deadly weapon, can be the cause of that denial and preclude ADA liability. Also, any proposed accommodations under the aegis of the ADA must be reasonable in context, and plaintiffs have not identified reasonable accommodations that could be applied in the factual circumstances presented by this case. Again, there were no exigent circumstances in this case, and Hines squarely establishes that where there are exigent circumstances, the ADA does not apply. Second, even if the ADA applied, no accommodation identified by plaintiffs was reasonable in the factual context presented to Officer Gallardo at that moment. I'll take a quick moment to quote what I think is the most important part of Hines. In the face of, quote, on-the-street responses to reported disturbances or other similar incidents, end quote, an officer is not required to reasonably accommodate until, quote, the area was secure and there was no threat to human safety, end quote. Officer Gallardo was not assured there was no threat to human safety until after the bullet was fired. With that, Your Honors, I'll leave the rest of my time for any questions the panel may have. What date did this occur? I believe that the date was June 27, 2021, Your Honor. Oh, okay. That explains why the sun was out. Thank you. Any other questions? Nope. Thank you, sir. Thank you, Your Honors. Mr. Cotar, rebuttal. Really, Your Honors, on the ADA, on the Hans or Hines case, the court there did not address what we have argued in this case, which is that the county should have had a reasonable accommodation policy for dealing with mentally ill by having crisis intervention technique policies. Hans did not address that, and we think the court can distinguish it on that basis. I now want to respond to my colleague's arguments. First of all, it is incorrect that the complaint says that Steve had a gun in the doorway. I specifically pled that the gun was, when Steve was shot and went down, the mother-in-law looked at him on the floor and told the officer, he does not have a gun in his hand. As after he was shot? Yes, right after he was shot and on the floor, right next to her. The gun is 13 feet away. His blood is not on it. She had told him to put it up. We do not plead that he had the gun in the doorway. So the cop was lying when he said put it up, put it up? We believe he was unreasonably mistaken. We have a 23-year-old rookie officer with a history of poor judgment and poor decision-making in his law enforcement history, and we believe he panicked. I cannot fathom how the gun ends up 13 feet away when an extremely intoxicated man is mortally wounded, shot in the heart. There's no blood on the gun also. So back to the Waller case. Mr. Waller went into his garage with a gun. He had a gun. The plaintiffs plausibly pled that he put it down and was not holding it. We believe Waller controls, and the court should apply it and we also have asked in both the district court and in this court, asking the court en banc or the court to overrule its moment of threat doctrine. Mr. or Deputy Gallardo opened the door, confronted this man, and we believe that that is a factor that should be considered in the totality of the circumstances on excessive force. I know that this panel cannot overrule the moment of threat doctrine. Judge Higginbotham wrote about it earlier this year in Barnes v. Felix, and we believe that without the moment of threat doctrine, this is, I believe, a pretty easy case. Now turning quickly to exigent circumstances. Again, we plausibly pled that they had dissipated. I'll summarize for the court. Deputy Gallardo responded to a call for a welfare check for a suicide threat. At the scene, he didn't act with exigency. His words and conduct did not indicate he believed there was an ongoing emergency. He encountered the sister-in-law and niece, and neither of them displayed concern or worry that there was an ongoing emergency, and he should have perceived that they were aware of Steve's situation because of their proximity. These well-pled facts and their reasonable emphasis demonstrate there was no ongoing emergency. Furthermore, Deputy Gallardo had 19-year-old Brianna walk him to Steve's front door. She didn't want to go first. He motioned for her to go and knock on the door. If there was an emergency, why did he place her between him and the threat? And the law on that is pretty clear that an officer's failure to protect persons near the alleged danger is indicative that no exigency existed, and that's what happened in this case. All right, sir. Thank you. We've heard you. Thank you, Your Honors. All right.